An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-1088

Filed 3 September 2025

Stanly County, No. 23JT000100-830

IN THE MATTER OF: C.D.W.

Appeal by Respondent-Mother from order entered 20 September 2024 by Judge Phillip L. Cornett in Stanly County District Court. Heard in the Court of Appeals 10 June 2025.

> *Kimberly Connor Benton and Deputy Parent Defender Annick Lenior-Peek, for Respondent-Appellant-Mother.*
>
> *No brief filed on behalf of the Guardian ad Litem.*
>
> *No brief filed on behalf of Petitioner-Appellee-Father.*

CARPENTER, Judge.

Respondent-Mother appeals from the trial court's 20 September 2024 order (the "Order") terminating her parental rights as to the minor child, C.D.W. ("Chloe").[1] On appeal, Respondent-Mother argues the trial court erred by concluding she willfully abandoned Chloe. After careful review, we reverse the Order and remand

---

[1] A pseudonym is used to protect the identity of the minor child and for ease of reading. *See* N.C. R. App. P. 42(b).

to the trial court.

## I. Factual & Procedural Background

On 18 September 2023, Petitioner-Father filed a petition to terminate Respondent-Mother's parental rights as to Chloe based on the ground of willful abandonment. On 10 January 2024, Respondent-Mother filed an answer, denying that she willfully abandoned Chloe. On 11 July 2024, the trial court commenced the termination of parental rights ("TPR") hearing. The evidence presented at the hearing tended to show the following.

Respondent-Mother and Petitioner-Father are the biological parents of Chloe, born in 2013. In addition, Respondent-Mother and Petitioner-Father share an older son, who has reached the age of the majority and is not the subject of this appeal. Respondent-Mother and Petitioner-Father never married but lived together from 1997 until they separated in early 2015. Since the parties separated, Chloe has continuously resided with Petitioner-Father.

On 25 January 2015, Petitioner-Father sought and obtained emergency custody of Chloe following Respondent-Mother's incarceration for assault after she slapped Petitioner-Father. Later, on 24 September 2015, the trial court granted Petitioner-Father legal and physical custody of Chloe (the "2015 Order"). The 2015 Order initially granted Respondent-Mother, who had been released from incarceration by this time, overnight weekend visits. The trial court later modified the 2015 Order to give Respondent-Mother supervised visitation with Chloe for three

hours every other Saturday. The 2015 Order specified that Respondent-Mother's uncle would supervise visitation with Chloe and that the parties would exchange custody of Chloe at the Albermarle Police Department.

Petitioner-Father and Respondent-Mother gave contradicting testimony concerning Respondent-Mother's visitation. According to Petitioner-Father, Respondent-Mother and her uncle attended two or three scheduled visits. After these visits, however, Respondent-Mother's uncle stopped attending. Petitioner-Father testified that Respondent-Mother occasionally tried to exercise visitation by herself, and he would not allow Respondent-Mother to exercise unsupervised visitation. Petitioner-Father further testified that, "after a few times of me going up there, [Respondent-Mother] just stopped showing up." According to Petitioner-Father, he stopped taking Chloe to the scheduled visits after Respondent-Mother did not show up for visitation at least twelve times. According to Respondent-Mother, however, Petitioner-Father stopped appearing for visitation around Christmas 2015, but she continued to show up at the Albermarle Police Department for visitation without a court-approved supervisor.

In 2016, Respondent-Mother filed three pro se contempt motions alleging that Petitioner-Father violated the 2015 Order by refusing to allow her visitation with Chloe. In her first contempt filing, Respondent-Mother requested that she be granted unsupervised visitation. Respondent-Mother testified that Petitioner-Father agreed to resume Respondent-Mother's visitation in response to her motions. Visitation,

however, did not resume and Respondent-Mother's contempt motions were ultimately dismissed. In 2017, Respondent-Mother was charged with trespassing after entering Petitioner-Father's home without permission in an attempt to visit Chloe. Apart from this incident, the record does not reveal any attempts by Respondent-Mother to exercise visitation since 2016.

Petitioner-Father maintained the same phone number from the entry of the 2015 Order until he changed his number after his "phone was destroyed" sometime in 2020. Petitioner-Father testified that he did receive "some Facebook messengers" from Respondent-Mother pertaining to their older son, but Respondent-Mother did not message, call, text, or otherwise contact Petitioner-Father about Chloe after 2015. Respondent-Mother testified that Petitioner-Father would not allow her to call and speak with Chloe or inquire about her well-being. Respondent-Mother further testified that Petitioner-Father blocked her from contacting him at his phone number and on Facebook in approximately March of 2017, and he eventually changed his phone number without sharing it with Respondent-Mother. According to Petitioner-Father, he did not share his new phone number with Respondent-Mother because he had "no way of contacting her."

Petitioner-Father resided at the same address from the entry of the 2015 Order until early 2021, when Petitioner-Father moved into a new home. Petitioner-Father testified that he continued to receive mail at his old address. Petitioner-Father did not inform Respondent-Mother of his new address. Respondent-Mother testified that

she could not locate Petitioner-Father because she did not know his new address or phone number. Respondent-Mother further testified that she unsuccessfully attempted to locate Petitioner-Father by contacting the Department of Social Services and Petitioner-Father's friends and relatives.

On 24 October 2022, Respondent-Mother filed a motion for contempt and motion to modify, alleging, in relevant part, that Petitioner-Father: (1) continuously denied Respondent-Mother's court-ordered visitation with Chloe, (2) changed his phone number and did not provide updated contact information to Respondent-Mother resulting in Respondent-Mother having no way to contact Petitioner-Father to schedule visitation with Chloe, and (3) threatened that Respondent-Mother would never see Chloe again if Respondent-Mother filed a motion for contempt. Respondent-Mother struggled to serve Petitioner-Father with her motion because she could not locate him. Ultimately, Respondent-Mother served Petitioner-Father by sheriff in August 2023, nearly a year after Respondent-Mother filed her motion.

On 18 September 2023, shortly after being served with Respondent-Mother's motion, Petitioner-Father filed a separate TPR petition alleging that Respondent-Mother willfully abandoned Chloe. The trial court stayed Respondent-Mother's motion pending resolution of Petitioner-Father's TPR petition.

At the conclusion of the adjudication phase of the TPR hearing, the trial court found that Respondent-Mother willfully abandoned Chloe during the six months immediately preceding the filing of the TPR petition. Following the disposition

phase, the trial court concluded that the termination of Respondent-Mother's parental rights was in Chloe's best interests. On 20 September 2024, the trial court entered the Order terminating Respondent-Mother's parental rights as to Chloe. On 26 September 2024, Respondent-Mother timely filed written notice of appeal.

## II. Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. §§ 7A-27(b)(2) and 7B-1001(a)(7) (2023).

## III. Issue

The issue is whether the trial court erred by concluding grounds existed to terminate Respondent-Mother's parental rights based on willful abandonment.

## IV. Analysis

Respondent-Mother argues the trial court erred in terminating her parental rights as to Chloe. Specifically, Respondent-Mother challenges certain findings of fact as being unsupported by the evidence and argues the trial court's findings of fact do not support its conclusion that Respondent-Mother willfully abandoned Chloe. For the following reasons, even assuming the challenged findings of fact are supported by clear, cogent, and convincing evidence, the findings of fact are not sufficient to support the trial court's conclusion that Respondent-Mother willfully abandoned Chloe.

"Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." *In*

*re Z.A.M.*, 374 N.C. 88, 94, 839 S.E.2d 792, 796 (2020); *see* N.C. Gen. Stat. §§ 7B-1109(e), 1110(a) (2023). "[A]n adjudication of any single ground in [N.C. Gen. Stat.] § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395, 831 S.E.2d 49, 53 (2019); *see also* N.C. Gen. Stat. § 7B-1110(a) (2023).

"We review a trial court's adjudication that a ground exists to terminate parental rights under [N.C. Gen. Stat.] § 7B-1111 to determine whether the findings are supported by clear, cogent, and convincing evidence and the findings support the conclusions of law." *In re A.M.*, 377 N.C. 220, 225, 856 S.E.2d 801, 806 (2021) (citations and quotation marks omitted). "[W]hether a trial court's adjudicatory findings of fact support its conclusion of law that grounds existed to terminate parental rights . . . is reviewed de novo by the appellate court." *In re M.R.F.*, 378 N.C. 638, 641, 862 S.E.2d 758, 761–62 (2021) (citation omitted). "Under a *de novo* review, [this Court] considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *In re T.M.L.*, 377 N.C. 369, 375, 856 S.E.2d 785, 790 (2021) (quoting *In re C.V.D.C.*, 374 N.C. 525, 530, 843 S.E.2d 202, 205 (2020) (alteration in original)).

Here, the trial court concluded that "sufficient grounds exist[ed] under [N.C. Gen. Stat.] § 7B-1111(a)(7) to terminate" Respondent-Mother's parental rights because she "willfully abandoned [Chloe] during the (6) consecutive months preceding the filing of the Petition." In support of this conclusion, the trial court made various

findings of fact, which Respondent-Mother argues are not supported by the evidence. Specifically, Respondent-Mother challenges the following findings of fact:

> 8. The [trial court's] findings during the relevant period, 6-consecutive months prior to the filing of the Petition:
>
>> a. Respondent has not sent any, gifts, cards, presents, or letters to the minor child even though Petitioner gets mail at [his] address and Respondent is familiar with that address and has the means and ability to do so.
>>
>> . . .
>>
>> c. No supervised visits have been arranged by Respondent pursuant to the 2015 Order during this time period.
>>
>> . . .
>>
>> e. There is a child support order in place for Respondent to pay $55.00 per month to support the minor child and compliance with this order has been sporadic.
>
> . . .
>
> 9. The Petitioner borne the primary responsibility of caring for the minor child from the date of birth until September of 2015, and since September 2015 has borne the sole responsibility of caring for said minor child.
>
> 10. During the relevant time-period, Respondent has not sent letters or gifts, visited with, or made contact by Facebook Messenger or otherwise, to check on her welfare of the minor child, even though she has the means and ability.
>
> 11. Respondent's intent to willfully abandon the minor child is also demonstrated by the findings preceding the relevant 6-month time period:
>
>> . . .
>>
>> b. Even though now Respondent argues that she had no way to comply with the 2015 Order because of a lack of participation by the supervision party in around the 2015-2017 time frame, she did not file for

a motion to modify the 2015 order until 2022 and in, the 2022 motion, like the 2017 filings, she simply blames the Petitioner for not allowing her to visit with the minor child and requests that he be held in contempt of court for not doing so. Also, the 2022 motion shows that Respondent could have filed for modification of custody any time before 2022 and did not.

c. Respondent's lack of care and concern for the minor child, including gifts, cards, birthday presents, or Christmas presents sent to Petitioner's addresses or no phone calls or Facebook Messenger contacts to check on minor child's welfare or set up a supervised visit, only further demonstrates that Respondent's efforts described above were not genuine, pointing more to the reality of an intent to willfully abandon the minor child.

Even assuming these findings of fact are supported by clear, cogent, and convincing evidence, the findings are insufficient to support the trial court's conclusion that Respondent-Mother willfully abandoned Chloe.

Under section 7B-1111(a)(7), the trial court must make sufficient findings of fact supporting the conclusion that the respondent-parent "willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition[.]" N.C. Gen. Stat. § 7B-1111(a)(7) (2023). While the relevant period for determining willful abandonment is the six consecutive months preceding the filing of the petition, *In re A.A.M.*, 379 N.C. 167, 172, 864 S.E.2d 509, 514 (2021), a "court may consider a parent's conduct outside the six-month window in evaluating a parent's credibility and intentions[.]" *In re N.D.A.*, 373 N.C. 71, 77, 833 S.E.2d 768,

773 (2019).

"A parent failing to have any contact [during the determinative six-month period] can be found to have willfully abandoned the child[.]" *In re D.J.D.*, 171 N.C. App. 230, 241, 615 S.E.2d 26, 33 (2005) (cleaned up). But willful abandonment "implies conduct on the part of the parent which manifests a willful determination to forego *all* parental duties and relinquish *all* parental claims to the child." *In re Young*, 346 N.C. 244, 251, 485 S.E.2d 612, 617 (1997) (emphases added). In other words, "the trial court must 'find evidence that the parent deliberately eschewed his or her parental responsibilities in their *entirety*.'" *In re A.L.L.*, 376 N.C. 99, 110, 852 S.E.2d 1, 9 (2020) (quoting *In re E.B.*, 375 N.C. 310, 318, 847 S.E.2d 666, 673 (2020) (emphasis added)). "If a parent withholds that parent's presence, love, care, the opportunity to display filial affection, and willfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *In re S.R.*, 384 N.C. 516, 526, 886 S.E.2d 166, 175 (2023) (cleaned up). In assessing willfulness, we consider: "(1) what options did the respondent-parent have to display parental affection during the six-month period, and (2) did the respondent-parent exercise those options." *In re X.I.F.*, ___ N.C. App. ___, ___, 911 S.E.2d 769, 781 (2025). As such, if

> the absence of such parental affection is caused by "one parent actively thwart[ing] the other parent's ability to have a relationship with their child," either by eliminating the other parent's options or by frustrating their ability to exercise them, then a trial court does not err in concluding

> no grounds exist to terminate parental rights under
> [section] 7B-1111(a)(7).

*Id.* at ___, 911 S.E.2d at 781 (alteration in original) (quoting *In re S.R.*, 384 N.C. at 527, 886 S.E.2d at 175).

In *In re B.R.L.*, our Supreme Court considered whether the trial court's findings of fact showed the parent had the necessary intent required for willful abandonment. 379 N.C. 15, 20, 863 S.E.2d 763, 768 (2021). Because the parent filed a motion seeking to increase her visitation with her minor child during the determinative six-month period, the Court concluded that the parent "did not intend to forego all parental duties and relinquish all parental claims to [the minor child]." *Id.* at 20, 863 S.E.2d at 768. As a result, the Court concluded that the parent's actions did not "rise to the level of willful abandonment[.]" *Id.* at 20, 863 S.E.2d at 768.

To support its conclusion that Respondent-Mother willfully abandoned Chloe, the trial court found that during the six months immediately before Petitioner-Father filed the TPR petition, Respondent-Mother did "not sent letters or gifts, visit[] with, or ma[k]e contact by Facebook Messenger or otherwise, to check on [the] welfare of [Chloe], even though [Respondent-Mother] has the means and ability." But the trial court also found that in August of 2022, Respondent-Mother filed a verified motion for contempt and motion to modify, arguing that Petitioner-Father was preventing her from seeing Chloe pursuant to the 2015 Order. The trial court further found that Respondent-Mother's motions were "stayed pending the resolution of this case."

Respondent-Mother's act of filing the motion for contempt and motion to modify is similar to the parent's act in *In re B.R.L.* This act by Respondent-Mother remains relevant to our willfulness determination despite it being outside the six-month period because we may look outside that period to evaluate a parent's "intentions." *See In re N.D.A.*, 373 N.C. at 77, 833 S.E.2d at 773. Moreover, Respondent-Mother and Petitioner-Father agree that: (1) Respondent-Mother only had supervised visitation with Chloe pursuant to the 2015 Order, and the court-approved supervisor ceased attending visitation after two or three visits; (2) Petitioner-Father had not given Respondent-Mother his updated phone number when it changed in 2020, and (3) Respondent-Mother was not successful in her attempts to serve Petitioner-Father with her motion for contempt and motion to modify until nearly a year after she filed them. It follows that Respondent-Mother's options to contact and locate Petitioner-Father, and consequently "display . . . parental affection" to Chloe, were limited. *See In re X.I.F.*, ___ N.C. App. at ___, 911 S.E.2d at 781. But Respondent-Mother still had the option to modify the 2015 Order, and she did "exercise [that] option" by filing the motion for contempt and motion to modify. *See id.* at ___, 911 S.E.2d at 781.

For these reasons, and consistent with our precedent, even assuming Respondent-Mother had not sent letters or gifts, visited with Chloe, or made contact with Petitioner-Father or Chloe by Facebook Messenger or otherwise, the trial court's findings do not support the conclusion that Respondent-Mother "manifest[ed] a

willful determination to forego all parental duties and relinquish all parental claims" as to Chloe. *See In re Young*, 346 N.C. at 251, 485 S.E.2d at 617. As a result, the trial court's conclusion that Respondent-Mother willfully abandoned Chloe is not supported by the findings. Because willful abandonment was the sole ground alleged for termination, we hold the trial court erred by terminating Respondent-Mother's rights.

We also note our concern that the trial court elevated Petitioner-Father's petition to terminate Respondent-Mother's parental rights over Respondent-Mother's pending motions to modify and hold Petitioner-Father in civil contempt. In other words, the trial court permitted Petitioner-Father's petition to subvert Respondent-Mother's Chapter 50 motions, thus changing the character of the civil custody proceeding by relying on Chapter 7B statutes or local rules, which are intended to expedite actions where DSS is a party because the juvenile(s) reside in temporary placements. A private TPR action differs from a TPR case initiated by a county or state agency under Chapter 7B, where our laws exist to ensure expediency both for the protection of fundamental parental rights and securing permanence for the juvenile(s) involved. In a private civil custody action, such as the one before us, the preferred procedural approach would have been for Petitioner-Father to bring the TPR issue before the trial court as a motion in the cause. Under the facts of this case, the trial court's willingness to stay Respondent-Mother's pending motions in the custody action and consider Petitioner-Father's TPR petition in a separate case

number prior to determining Respondent-Mother's motions, permitted Petitioner-Father to gain unfair, strategic advantage without resolving a salient pending issue that is foundational to the trial court's ultimate determination. By permitting the filing of a private TPR petition to automatically and fundamentally change the character of a custody action, the trial court opens the door to an element of gamesmanship in contentious custody matters.

At this juncture, when the Court issues its opinion, Respondent-Mother's modification action is moot whereas her contempt action may not be. Assuming Respondent-Mother is ultimately successful on her contempt motion, the trial court will have permitted Petitioner-Father to fail to comply with the 2015 Order and avoid service before obtaining an outcome he may not be entitled to under the logic of the Order. If Petitioner-Father is found to be in contempt after obtaining a favorable TPR judgment, Respondent-Mother's contention that Petitioner-Father manufactured the six-month period to his benefit may have merit, without the opportunity to obtain meaningful appellate review. In other words, if Respondent-Mother ultimately succeeds in establishing that Petitioner-Father willfully violated the 2015 Order, Petitioner-Father will have "actively thwarted" Respondent-Mother's "ability to have a relationship with" Chloe, which undermines a finding of willful abandonment as Respondent-Mother's ability to have a relationship with Chloe will have been "eliminated" or "frustrat[ed]" by means outside of her control. *See In re X.I.F.*, ___ N.C. App. at ___, 911 S.E.2d at 781.

Instead of automatically prioritizing private TPR petitions in open Chapter 50 matters with pending contempt motions, which if left unresolved may create an avenue for collateral attack on the validity of an eventual TPR judgment, the preferred approach is to bring a motion in the cause seeking termination and litigate all custody issues under the same file number. This practice ensures that both parents have a full and fair opportunity to litigate all claims relevant to the custody action. Further, this practice mitigates the effect of any procedural gamesmanship created by the ill-advised practice of viewing TPRs involving a county of state agency and TPRs not involving a county of state agency through the same lens.

## V. Conclusion

Because the trial court's findings of fact do not support its conclusion that Respondent-Mother willfully abandoned Chloe, the trial court erred by terminating Respondent-Mother's parental rights. Accordingly, we reverse and remand for further proceedings not inconsistent with the holding of this opinion.

REVERSED AND REMANDED.

Chief Judge DILLON and Judge MURRY concur.

Report per Rule 30(e).